**S. J. GROVES & SONS COMPANY, a corporation, Plaintiff,**

**v.**

**WEST VIRGINIA TURNPIKE COMMISSION, Defendant.**

**Civ. A. 1783.**

United States District Court
S. D. West Virginia.
Aug. 20, 1958.

judgment to determine its rights with reference to a contract with the West Virginia Turnpike Commission (hereinafter referred to as the Commission) for unclassified excavation at an agreed price in connection with the construction of the West Virginia Turnpike. The complaint also prays for judgment against the Commission for the amount which the Contractor claims is due and unpaid to it under the contract.

The complaint is in two counts. Count I states a claim for $83,767.60, based on a provision in the contract dealing with an allowance for overbreakage, as will be later gone into more fully. Count II claims $355,545.40, based on large quantities of excavation made by the Contractor outside the original design lines as shown on the plans prepared by the Commission.

The Commission's defense against the claim set up in Count I is that it has already paid the Contractor all that was due it under the terms of the overbreakage provision of the contract, as properly interpreted. Its defense to Count II is threefold: (1) that the contract requires as a condition precedent to the Contractor's being paid for excavation outside the overbreakage line that written authority from the engineer be secured, and that no such written authority was ever given; (2) that most, if not all, of the excavation outside the overbreakage line was brought about by the carelessness of the Contractor in "overblasting;" and (3) that the Contractor assumed the risk of encountering the kind of material for the excavation of which it claims compensation.

Vincent V. Chaney, of Charleston, W. Va. (Frederick W. Newton, of New York City, on the brief), for S. J. Groves & Sons Company.

Lee M. Kenna, of Charleston, W. Va. (Stanley C. Morris, of Charleston, W. Va., on the brief), for West Virginia Turnpike Commission.

BEN MOORE, Chief Judge.

Plaintiff (hereinafter referred to as the Contractor) sued for a declaratory

The Commission raised a jurisdictional question, moving the Court to dismiss the action on the ground that the Commission is an agency of the State of West Virginia, and therefore immune to suit. This motion was denied. The case was tried by the Court without a jury. Several witnesses were examined both on behalf of the Contractor and the Commission, and numerous exhibits were filed. At the conclusion of the

hearing the Court made oral findings of fact from the bench as follows:

"[T]hat the contract, which is in evidence with the pleadings as Plaintiff's Exhibit Number 1, governs all the transactions of the parties except and unless as modified by the dealings between them. That's a finding, I suppose, which is a mixed finding of fact and law.

"To proceed to the pure findings of fact, I will announce them as follows: first, that some considerable excavation of materials which were naturally unsuitable within the purview of section 4.3D of the contract, that is, they were naturally unsuitable for the stability of the slopes, considerable of that material was excavated by the contractor outside the design lines.

"Two, that some areas within the design lines were not excavated to those lines.

"Three, that some areas were excavated to a point between the design neat lines and the twelve inch outside overbreakage line.

"Four, that the conversation between the contractor and the representatives of the engineers, which is relied on by plaintiff to establish authority for the removal of loose, unstable and unsuitable material outside the design lines and which was relative to the situation shown by the photographs introduced in evidence as Plaintiff's Exhibits 3, 4, and 5, was to the effect that the engineers verbally ordered loose material which was outside the neat line to be removed without any statement as to whether it would be paid for or not; and, further, that the contractor was told at that time to do likewise in any similar situations met, but he was also told that the slope would not be changed from a sandstone slope to a shale slope.

"Four (a), that the particular instance of loose and unstable material at the site shown by the photographs put in evidence as Plaintiff's Exhibits Numbers 3, 4, and 5, was not natural but was caused by the contractor's blasting too close to the line.

"Five, that plaintiff did not notify the engineer of any intention to claim payment for any excavation outside the design lines not authorized in writing by the engineer, and the engineer gave no authorization in writing for any such excavation.

"Six, the engineer had knowledge at all times during the progress of the work of how the work was being done and that excavations were being made outside the neat lines, that slopes were being changed, and that some excavation inside the neat lines was not being made.

"Seven, that the engineer did not object to any of these variations during the progress of the work.

"Eight, that after the contractor had concluded his work the engineer notified the contractor that certain parts of the work covering the claims in dispute would be accepted only conditionally, that is, payment would be made only to the actual excavation lines and no payment at all would be made for excavation outside the design lines as augmented by the twelve inch overbreakage line unless authorized in writing prior to the excavation being made, and that when such notice was given the plaintiff had no time or opportunity for effective protest against that claim as set out in the notice."

Some time later motions were made by both parties for certain modifications of these findings. Both motions were denied. However, on my own motion, I add to finding number four the further finding that the Commission's engineer in charge of the work repeatedly thereafter gave oral directions to the Contractor's agents to remove material at various places as unsuitable for the stability of slopes.

Turning our attention first to Count I, we find that the contract between the parties contains the following provision with reference to an allowance for overbreakage.

"The quantity of Unclassified Road Excavation for which payment will be made will be the volume measured in its original position, computed by the average end area method from cross-sections taken before the removal of the material and from the neat excavation lines as shown on the Plans, or as established by the Engineer, except that for rock in mass formation the payment planes shall be six (6) inches below the template grade and the inner slope of roadway ditches, and one (1) foot outside and below the neat slope and bench lines respectively shown on the Plans, thus providing the allowance for overbreakage."

The entire claim asserted here, as well as in Count II, concerns that type of excavation which is referred to in the contract as "rock in mass formation." This term is defined in the contract to mean "material which is determined by the engineer to be so hard that it is not practicable to loosen or handle it with a three-quarter yard power shovel except by preliminary blasting." There is no contention by defendant that any of the excavated material for which payment is claimed was other than rock in mass formation, as defined in the contract.

All the witnesses agree that rock in mass formation can not be excavated to a uniformly straight line. This is so because the blasting which is necessary to loosen the rock so that it may be removed with a power shovel can not be so precisely controlled as to break all the rock loose at the same depth. This is true both as regards the slopes in cuts and also the roadbed. I find from the evidence that, in excavating for slopes in the rock cuts, the Contractor sometimes removed rock beyond the one foot overbreakage allowance line. At times the rock was removed to a point somewhere between the design line of the slope and the overbreakage line, and sometimes the design line itself was not reached.

I think the obvious intention of the contract provision which is quoted above is to compensate the Contractor for what he would otherwise have lost through the necessary variation in the actual excavation extending over and beyond the one foot overbreakage line, by establishing the overbreakage line as the "payment plane."

The evidence in this case discloses, and if it did not it is a matter of common knowledge, that when blasting operations are conducted in solid rock a straight line cannot be followed without using such a large number of blast holes as to make the process uneconomical and unfeasible; or by setting the charges at such a distance from the desired line that the first blast may not loosen all the rock back to the line, so that a second blast is made necessary. The provision of the contract allowing an extra foot beyond the design lines for overbreakage must be interpreted in view of this peculiarity which is always present in rock blasting. To make sure that the design line is reached at all times, it is unavoidable that the Contractor sometimes loosen and remove substantial quantities of rock, not only outside the design lines, but outside the extra one foot allowance area as well. The intention of the contract as I interpret it is that the one foot allowance for overbreakage outside the design lines is considered to be the average quantity of rock which the Contractor may be expected to remove outside those lines in order to reach them at all points. This construction I believe is borne out by the language of the contract in which the line one foot outside the slope line shown on the plans is called the "payment plane."

It is contended by the Contractor that he should be paid for all material extending out to the overbreakage line or payment plane, even though he may

not have excavated it at some points as far as the slope line shown on the plans. On the other hand, the Commission takes the position that the Contractor is entitled to payment neither for (1) material which it failed to excavate inside the design line, nor (2) unexcavated material between the design line and the line one foot outside this line, or "payment plane."

I do not agree with either of these arguments. It has already been shown that the intention of the parties as disclosed by the contract provision was to establish a line which would represent throughout a fair *average* of the outside excavation line *actually reached* by the Contractor in its effort to excavate *to the design line* at all points. None of the material within the one foot allowance area, and none outside that area (unless it be such as is claimed in Count II) was intentionally loosened so that it had to be removed. Its removal was a necessary concomitant of the work, brought about by the inexactness of blasting operations in rock as compared with the relatively simple process of conforming to an approximately straight line in soft earth or gravel.

However, the Contractor is not excused by the allowance provision from his obligation to excavate at all points to the design line. On the contrary, in my opinion, it is clear that any unexcavated material within the design lines must be calculated and deducted from the total measurement to the "payment plane."

The conclusion, therefore, with reference to Count I of the complaint is that the Contractor is entitled to recover for all materials in areas of rock in mass formation not already paid for, whether excavated or not, extending to the outside of the one foot allowance line for overbreakage, otherwise known as the payment plane, less the amount of materials left in place and unexcavated within the design line.

It is unnecessary to take further evidence on the Count I claim, since the plans introduced as exhibits show the actual excavation lines, and the amount due, if anything, can be readily calculated from those exhibits.

Count II of the complaint presents an entirely different question, namely: Is the Contractor entitled to payment for all or any part of materials excavated outside or beyond the overbreakage line as shown on the plans, without prior authority or direction *in writing* by the engineer?

Counsel have cited many disconnected provisions of the contract which are asserted to have a bearing on this question. All are in my opinion dependent upon a few specific provisions which deal with the situation and type of materials involved here. Hence these only will be set out. They are:

A. "When soft, mucky, spongy or other materials which, in the opinion of the Engineer, are unsuitable for foundation of the roadbed or embankment or for the stability of slopes and ditches, are encountered (a) below the neat section lines (template grade, ditches and slopes) in cut sections * * * such material shall be removed within the lateral limits and to the depths specified by the Engineer.

\* \* \* \* \* \*

"All such unsuitable materials excavated by the order of and within the lateral limits and to the depths specified by the Engineer, will be measured and paid for as Unclassified Roadway Excavation; any material removed in excess of approved limits and depths will not be measured for payment * * *.

B. "Any deviation from the Plans or Specifications, which may be required by the exigencies of the construction, shall be determined by the Engineer and authorized by him in writing.

C. "No allowance may be made for * * * excavation * * * beyond the slope lines shown on the cross-sections, except as otherwise

specifically noted or authorized by the Engineer in writing.

D. "Slope lines, benches, ditches and other features shall conform to the lines, grades, and dimensions shown on the Plans or as established by the Engineer, and such lines, grades and dimensions may be varied only as directed or approved in writing by the Engineer.

E. "No material removed beyond the slope lines, special bench lines or below the template grade line shown on the Plans, except for the overbreakage allowance for rock in mass formation, shall be included for payment unless authorized in writing by the Engineer. Slide material removed beyond the slope lines or beyond the payment lines for rock in mass formation, not attributable to carelessness, overshooting or unsuitable construction methods on the part of the Contractor, shall be included for measurement only when so authorized. The authorized undergrading of cuts and excavation or embankment foundation areas for the removal of unsuitable material, and the authorized stripping of cut and embankment foundation areas, will be measured and included for payment under this item.

F. "Work done * * * beyond the lines shown on the Plans or as given, except as herein provided, or any extra work done without prior written authority of the Engineer, will be considered as unauthorized and will not be paid for under the provisions of the Contract. * * *"

Among these quoted excerpts from the contract, I shall first discuss those which I have designated as "B," "C," "D" and "F."

"B" deals with deviations from the plans or specifications which may be required by the exigencies of the construction. Webster's Dictionary defines "deviation" to mean "a wandering from the way; variation from the common

way, from an established rule, standard, position, etc.," and the same authority defines "deviate" to mean, "to change the course or direction of, as of a road." I cannot regard the removal of unsuitable materials made necessary in order to establish a stable slope as a "deviation" within this definition. It has quite the contrary effect, for unless slopes were stabilized there would indeed have been a deviation from the specifications, which require that when unsuitable material is encountered "such material shall be removed within the lateral limits and to the depths specified by the Engineer."

"D" is subject to much the same comment. It allows *variations* from the slope lines *shown on the plans or as established by the engineer* only when directed in writing by the engineer. The engineers who testified explained that slope lines in areas such as that with which we are concerned, are laid out either as shale slope or sandstone slope, according to the character of the excavation expected to be encountered. It is common knowledge, of course, that an earth slope requires an even flatter plane for stability. Variance implies a change or departure from a fixed norm. In my opinion, as used in "D," the reference is to the type of slope, whether sandstone, shale or earth, and the removal of unsuitable material in order to provide a stable slope is not a variation thereof within the meaning of that provision.

Moreover, the Contractor by this provision is not held to the slope lines as shown on the plans, but may follow the lines "established by the engineer," and there is no requirement that they be established by a writing.

"C" contains the saving phrase, "except as otherwise specifically noted." It is subordinate, therefore, to any specific provisions on the subject.

"F" likewise includes a similar phrase, "except as herein provided," which necessarily refers us to other specific provisions, if such exist.

Such provisions do appear in the contract. They consist of those excerpts

which I have designated above as "A" and "E."

It will be observed in "A" that if the contractor should remove materials thought by the engineer to be unsuitable for the stability of slopes (no writing specified), it was entitled to have these measured and paid for, unless the excavation was in excess of limits and depths specified by the engineer. The only condition precedent to the Contractor's right *and duty* to remove unsuitable materials to achieve slope stability is the opinion of the engineer (however expressed) that they are unsuitable.

The provision of excerpt "E" that "No material removed beyond the slope lines * * * shall be included for payment unless authorized in writing by the Engineer" must be interpreted in one of two ways. Either interpretation requires that some words be supplied to complete the meaning.

Does the sentence mean that no such materials "shall be included for payment unless (the removal thereof shall have been) authorized in writing by the Engineer?" Or does it mean none such "shall be included for payment unless (such inclusion for payment is) authorized in writing by the Engineer?"

██ Aside from the fact that the latter is, in my opinion, the more grammatical construction, we must bear in mind the rule that if ambiguous language is found in a contract, that construction of the language should be adopted which is most consistent with the terms of the contract as a whole.

Had it been the intention that prior written authority from the engineer was necessary before the removal of unsuitable material in various locations in order to establish stability of the slope at those points, would not the parties have made that requirement clear in that part of the contract (excerpt "A") which deals with that subject? The necessity of a writing is set forth at many places in the contract with reference to various matters, but in that provision dealing with the removal and disposition of unsuitable materials no mention is made of any such requirement.

There is indeed, in my opinion, little ambiguity as to the true meaning of this provision. It is not the removal of unsuitable materials which must be authorized in writing, but their inclusion for payment. It has already been made plain, as set out in excerpt "A," that the mere opinion of the engineer that they *are* unsuitable casts upon the Contractor the *duty* to remove unsuitable materials. The language means that the engineer must decide whether materials *already* removed outside the design lines are (1) materials which the contract requires the Contractor to remove without pay, such as loosened rock and earth caused by overblasting, (2) unsuitable materials which have been removed from areas beyond the lateral limits or below the depths specified by the engineer in his directions given for their removal, or (3) unsuitable materials removed from areas within the lateral limits and not beyond the depths specified by the engineer. The first two classes of course would not be included for payment; and the contract required, as might be naturally expected, that the third class would be included only on written authorization of the engineer.

Moreover, the agents of the engineer themselves, as representatives of the Commission clothed with authority to direct the work on its behalf according to the terms of the contract, saw no reason to require written authority for the removal of unsuitable materials. Actually, so far as the engineer is concerned, the dispute with the Contractor is entirely aside from any question of the necessity for written authority. The engineer's agent refused to include the materials mentioned in Count II for payment, not because the removal thereof was not authorized in writing, but because of his belief that the materials were not removed in order to establish stable slopes, but because they had been loosened by overblasting. It is not disputed in the evidence that Hayden, the

engineer on the job, repeatedly gave oral directions to the Contractor to remove unsuitable materials and lay back slopes to achieve stability. Herendeen, one of the engineers, who was a witness, testified that, if he were satisfied that the materials for the removal of which claim is made in Count II were actually unsuitable materials excavated to provide stability for slopes, he would have included them for payment.

We are therefore brought to the question: Does the requirement of the contract (excerpt "E"), that no material removed beyond the slope lines should be included for payment unless authorized in writing by the engineer, preclude the Contractor from recovering for material removed by it which was, in the opinion of the engineer then on the job, unsuitable for the stability of slopes, merely because the engineer charged with the duty of approving payment refused to authorize payment for such material because he believed it to be material which the contract required the Contractor to remove without pay?

 In my opinion, the question answers itself. When the Contractor has performed work required by the contract to be performed by him, he has the right to compensation therefor. The engineer cannot defeat that right by refusing, from a mistaken opinion as to the facts, to authorize payment in writing.

I am not herein voicing any opinion or making any decision upon the factual question of how much, if anything, the Contractor is entitled to recover under Count II. I merely declare its right, which is to recover at the contract price for whatever materials it is able to show by subsequent testimony were removed by it which were, in the opinion of. the engineer, unsuitable for the stability of slopes, and which were not removed beyond the lateral limits or below the depths specified by the engineer.

At those points where the slopes were intentionally laid back to produce stability, resulting in a recovery by the Contractor under Count II, it cannot, of course, have the benefit also of the one foot overbreakage allowance covered by Count I, since this would amount to double payment for the same work. Furthermore, the Contractor is precluded by the plain terms of the contract from recovering compensation for any materials, removal of which was due to overblasting.

The defense of assumption of risk set up in the Commission's defense to Count II does not apply, of course, to material removed at the direction of the engineer.

The case will be referred to a master for the purpose of taking evidence, making a determination of the character of the materials for which claim is made in Count II, and calculating what, if anything, is due the Contractor therefor.